**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| Dulce Huerta, | § | |
| | § | |
| | § | |
| | § | CASE NO. 3:23 Civ. 2529 |
| | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| vs. | § | **JURY DEMANDED** |
| | § | |
| PANINI AMERICA, INC., | § | |
| | § | |
| | § | |
| *Defendant.* | § | |

<u>**COMPLAINT AND JURY DEMAND**</u>

TO THE HONORABLE DISTRICT COURT:

Plaintiff Dulce Huerta ("Ms. Huerta"), on behalf of herself and all similarly situated (the "Class Representative") presents her Complaint against defendant Panini America, Inc. ("Defendant" or "Panini") for unlawful discrimination and retaliation in violation of 42 U.S.C. § 1981 ("Section 1981").

## I.    NATURE OF THIS ACTION

1.    Panini has built its business on the labor, talent, and excellence of countless athletes of color while systematically marginalizing and abusing Non-Caucasian Employees in its own workplace.   Employees who do not identify as Caucasian, encompassing individuals from diverse racial backgrounds including, but not limited to, African-American, Latin American, Asian American, and other minority

racial groups are referred to herein as "Non-Caucasian Employees." These Non-Caucasian Employees have faced or have been at risk of facing racial discrimination, differential treatment, and racial hostility in the workplace.

2.      This Complaint seeks to hold Panini accountable for the racially discriminatory hostile work environment it has created and nurtured and furthermore rectify the racially charged environment that Ms. Huerta and her colleagues endured.

3.      Panini's leadership is racially and ethnically segregated from the staff. Despite the company's vast number of employees in the United States, there is a wholly uncoincidental absence of diversity in its top positions. Non-Caucasian employees, including Mexican-Americans like Ms. Huerta, find themselves substantially unrepresented in leadership roles. In a company as large as Panini, this absence of diversity in leadership is glaring and indicative of deeper systemic issues.

4.      Panini's workplace culture isn't just subtly racist; it's overt. The deliberate physical segregation of Non-Caucasian employees' desks from their Caucasian counterparts speaks volumes. Ms. Huerta, during her tenure, was subjected to derogatory comments, especially from Caucasian colleagues, including a manager named David. These comments often took the form of "jokes" – racial and ethnic tropes – targeting Mexicans and their attire.

5.      Panini's Black and Latinx employees are routinely labeled by Caucasian supervisors as "lazy," "unmotivated," and "insubordinate." Such gross

weaponization of anti-Black and anti-Latinx stereotypes is unacceptable in itself, and inevitably here is coupled with the objective reality that these same Black and Latinx employees matched or exceeded the productivity of Caucasian counterparts who were not subjected to these derogatory labels.

6.      Ms. Huerta, being of Mexican-American descent, was not spared from Panini's discriminatory practices. Panini's Caucasian employees have numerous times asked Latinx American employees about the number of children they had – and went on to tell the Latinx American employees that they would be able to work more quickly and efficiently if they were not "distracted" by having so many children. Needless to say, Caucasian employees were not harassed in this manner.

7.      Ms. Huerta's tenure at Panini was marred by racial and ethnic insensitivity and outright discrimination.  Beyond the derogatory comments, she experienced the company's preference for pushing employees to resign rather than addressing their grievances. Ms. Huerta's own experience, where she was publicly humiliated through a transparently racially and ethnically motivated reprimand for a minor dress code violation – one that she experienced innumerable Caucasian employees commit repeatedly without reprimand or consequence – exemplifies the company's racist approach to non-Caucasian employees.

8.      Ms. Huerta, a dedicated employee of Panini, found herself in a company that, ironically, heavily relies on the talents of Black, Brown, Latinx, and Asian-American athletes for its success. It's estimated that 75% or more of Panini's business

is derived from non-Caucasian athletes, making its discriminatory practices even more egregious.

9.      Defendant has a pattern and practice of discrimination against Non-Caucasian Employees, including Ms. Huerta. The pattern and practice is systemic, persistent, and continuous, and manifests itself in at least the following ways:

- Terminations based on racial animus;

- Racially-motivated taunting or comments by co-workers and supervisors;

- Low numbers of minority employees, including and especially at the supervisory level; and

- Difficulties in minority employees, like Ms. Huerta, in achieving equitable promotion rates.

10.     All of Panini's racist and abusive employment practices appear to have been effectively concealed, year-over-year, from its customers, business counterparties, and the public at large. Panini has deliberately attempted to insulate itself from the ignominy and liability that comes with its culture of racism, by paying lip service to racial diversity. For instance, in its institutional "Code of Ethics," Panini professes to believe that "diversity is an opportunity in terms of innovation and development through dialogue and exchanging ideas, opinions and experiences." However, Ms. Huerta's experiences and the experiences of her colleagues paint a different picture, as the reality of Panini's exploitation of Non-Caucasian Employees

makes clear that this is not a sincerely-held ideal of which Panini has fallen regrettably short.  It is an insincere, faux-progressive platitude meant to deflect scrutiny from an office culture suffused in racism.

11.    While Panini's horrific employment environment and practices appear to have been effectively concealed from its customers, business counterparties, and the public at large, upon information and belief, Panini's leadership has been fully aware of the systemic racial discrimination they have fostered and actively practiced in its workplace, commencing at least as early as 2017 and continuing until 2020.

12.    Fortunately, Panini has recently come under public scrutiny for its systemic and pervasive racial discrimination against Non-Caucasian Employees, including through failure to take adequate steps to promote and secure diversity, equity and inclusion in Panini's workplace.

13.    In May of 2023, social justice and civil rights groups Until Freedom and Black Church PAC sent a scathing demand letter to Panini, and to the commissioners and heads of the NBA, NFL, MLB, National Women's Soccer League, MLS, and the NHL (the "Open Letter").  The Open Letter set forth pointed criticisms of Panini's hiring and employment practices and demanded that Panini, which benefits heavily from Black and other non-Caucasian bodies, have in place employment policies that ensure adequate representation and fair treatment throughout its business structure.

14.    As the Open Letter pronounced, "Panini's simultaneous profiting from

its collaborations with black and brown athletes on the one hand, and exclusion of black people and other Non-Caucasians from its leadership on the other hand, is unacceptable."

15.     The Open Letter, attached as Exhibit A, authored by leaders Tamika D. Mallory and Reverend Michael McBride, criticized Panini's glaring lack of black and Latinx leadership. Despite 75% of its business stemming from black and brown athletes, only 3 of Panini's 800 employees on LinkedIn are black. Highlighting this disparity, the letter demanded immediate reforms and threatened potential boycotts. The concerns were also shared with state Attorney Generals in Texas, New York, and California. *See*, *e.g.*, *https://finance.yahoo.com/news/until-freedom-co-founder-tamika-130000815.html.*

16.     The experiences highlighted in the Open Letter resonate with Ms. Huerta's own experiences at Panini. The discriminatory practices weren't isolated incidents but were part of a larger, systemic issue.

17.     However, the hallmarks of racial injustice noted in the Open Letter are not unique to the African-American employees that work for Panini. Ms. Huerta's experiences as a Mexican-American employee further highlight the pervasive discrimination against all Non-Caucasian employees at Panini, for which the culture and employment environment at Panini both implicitly and explicitly favors Caucasian employees at the expense of Non-Caucasian Employees.

18.     Ms. Huerta, along with the other Non-Caucasian Employees,

consistently faced a hostile work environment. They were treated poorly compared to their Caucasian counterparts, not because of their skills or performance, but purely based on their race.

19.    Ms. Huerta, during her tenure at Panini, experienced firsthand the company's discriminatory practices and hostile work environment. Her experiences are a testament to the broader issues within the company.

20.    Ms. Huerta seeks to bring forth claims based on Panini's unlawful discrimination against her and potentially other Non-Caucasian Employees. This includes, but is not limited to, discriminatory policies, practices, and procedures in selection, promotion, and advancement; disparate pay; differential treatment; and racial hostility in the workplace.

21.    As a remedy for Panini's unlawful actions, Ms. Huerta seeks declaratory and injunctive relief; back pay for the period she was subjected to discrimination; potential front pay; compensatory and punitive damages; and attorneys' fees, costs, and expenses. This is to address Panini's discriminatory employment policies, practices, and procedures that she endured.

22.    Ms. Huerta also assert violations on her own behalf for unlawful retaliation for reporting and opposing racial discrimination, pursuant to 42 U.S.C. § 1981.

## II.    JURISDICTION AND VENUE

23.    This Court's jurisdiction is invoked pursuant to 28 U.S.C. § 1343(a)(4)

and 28 U.S.C. § 1331. This is a discrimination suit authorized and instituted pursuant to the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981").

24.    Venue is proper in the Northern District of Texas pursuant to 28 U.S.C. §§ 1391(b)(1) and 1391(c) because Defendant is subject to personal jurisdiction and resides in Texas.

25.    The Northern District of Texas is the most logical forum in which to litigate the claims of the Class Representatives and the proposed class in this case. Plaintiffs worked at Defendant's facility in Dallas County. Furthermore, the Class Representatives and many of the potential class members reside in the Northern District of Texas.

## III.    PARTIES

26.    Plaintiff Ms. Huerta is a citizen of the United States and a resident of Texas. Ms. Huerta is Mexican-American and worked at Panini from 2017 to 2020.

27.    Defendant Panini America, Inc. does business in Dallas County, Texas in the State of Texas. Its principal place of business is located at 5325 FAA Blvd., Suite 100, Irving, Texas 75061. Panini's contacts with the State of Texas are systematic and continuous, and the acts of discrimination that are the basis for the claims against Panini took place in Dallas County, Texas.

## IV.    BACKGROUND FACTS

28.    Panini is an operating subsidiary of Panini S.P.A., an entity which holds itself out as an international brand leader within the world of sticker and trading card

collectibles.

29.    As noted, Panini has recently come under close public scrutiny for systemic and pervasive racial discrimination against Non-Caucasian Employees, including through failure to take adequate steps to promote and secure diversity, equity and inclusion in Panini's workplace.

30.    In May of 2023, social justice and civil rights groups Until Freedom and Black Church PAC sent a scathing demand letter to Panini, and to the commissioners and heads of the NBA, NFL, MLB, National Women's Soccer League, MLS, and the NHL (the "Open Letter").  The Open Letter set forth pointed criticisms of Panini's hiring and employment practices and demanded that Panini, which benefits heavily from Black and other non-Caucasian bodies, have in place employment policies that ensure adequate representation and fair treatment throughout its business structure.

31.    As the Open Letter pronounced, "Panini's simultaneous profiting from its collaborations with black and brown athletes on the one hand, and exclusion of black people from its leadership on the other hand, is unacceptable."  *See*, *e.g.*, *https://finance.yahoo.com/news/until-freedom-co-founder-tamika-130000815.html.*

32.    As a Non-Caucasian Employee, Ms. Huerta and those similarly situated seek to represent themselves in claims of racial discrimination against Panini.

33.    Ms. Huerta is Mexican-American and was  subjected to race-based discrimination by Defendant.

34.     Ms. Huerta was employed at Panini for approximately 5 years,

primarily in shipping and receiving for customer service.  During her tenure at the company, Ms. Huerta experienced acts of racial discrimination that created a hostile work environment and are consistent with the allegations in the Open Letter that received national media attention.

35.     During her employment at Panini, Ms. Huerta observed that desks of Non-Caucasian Employees were deliberately grouped together, segregated from the work locations of their Caucasian counterparts. This intentional physical separation was not only demeaning but also served as a continuous reminder of the company's discriminatory practices. Moreover, Ms. Huerta faced derogatory comments, particularly from Caucasian colleagues, including a manager named David. These remarks often manifested as "jokes" that targeted Mexicans, specifically mocking their attire. Additionally, Ms. Huerta, being of Mexican-American descent, was subjected to inappropriate comments by Panini's Caucasian employees. They frequently inquired about the number of children Latinx American employees had, insinuating that Latinx employees would be more efficient if they weren't "distracted" by having so many children. It's worth noting that Caucasian employees were never subjected to such derogatory remarks.

36.     Panini's discriminatory practices were not limited to any one racial or ethnic group. Ms. Huerta, during her time at the company, witnessed and experienced numerous instances of racial bias. Panini's flagrant abuse of Non-Caucasian employees is characteristic of the acts of discrimination that Ms. Huerta experienced

on an ongoing basis throughout her employment at Defendant, including, without limitation:

- Derogatory comments and jokes targeting Mexicans, particularly about their attire, as Ms. Huerta personally experienced from colleagues, including a manager named David;

- Recurrent instances where Latinx employees, like Ms. Huerta, were subjected to inappropriate comments. For instance, Ms. Huerta heard comments suggesting that Latin American employees would be more efficient if they weren't "distracted" by having many children, a line of questioning and commentary not directed at their Caucasian counterparts.

These are merely two examples of the many patently racist acts that Ms. Huerta personally observed during her tenure working for Defendant.

37.     During Ms. Huerta's tenure at Panini, she observed deliberate attempts by the company to mask its discriminatory practices. For instance, she noticed that certain employees were given titles or "promotions" that didn't come with any real change in responsibilities, pay, or authority. In Ms. Huerta's own experience, she was moved from customer service to sales, but the nature of this move and its implications need further exploration to determine if it was genuine or another instance of Panini's superficial attempts at diversity.

38.     Ms. Huerta was forced to leave Panini in 2020 after facing a particularly

humiliating incident involving the company's HR over a dress code violation. While the immediate reason for her departure was the dress code issue, the underlying reasons were the consistent racial biases and discriminatory practices she experienced and observed. After her departure, she reported her experiences to her temp agency and to a manager at Panini, who offered her an opportunity to return, which she declined due to the humiliation already suffered and the hostile workplace that she had endured.

## V.     CLASS ACTION ALLEGATIONS

### A.     Class Definition

39.     The Class Representatives seek to maintain claims on their own behalf and on behalf of a class of current and former employees of Defendant.

40.     The intended class consists of Non-Caucasian Employees who are, or have been, employed by Defendant and experienced race discrimination at any time during the applicable liability period or have experienced retaliation for reporting or opposing race discrimination. Huerta, as Class Representatives, are representative of the class. Upon information and belief, there are several hundred members of the proposed class.

41.     Additional classes may come forward in response to this complaint, and the Class Representatives and their counsel will apprise the Court, including potentially through one or more amended complaints, if such additional classes arise.

### B.     Efficiency of Class Prosecution of Common Claim

42.     Certification of a class of employees similarly situated to the  Class Representatives offers the most efficient and economical means of resolving  the questions of law and fact common to the claims of the Class  Representatives and the proposed class.

43.     The individual claims of the Class  Representatives require resolution of the common question of whether  Defendant engaged in a systemic pattern or practice of race  discrimination against Non-Caucasian Employees or of retaliation for reporting or opposing race discrimination.

44.     The Class Representatives seek  remedies to eliminate the adverse effects of such discrimination in their own  lives, careers and working conditions and in the lives, careers and working  conditions of the proposed class members, and to prevent continued racial  discrimination and retaliation in the future.

45.     The Class Representatives have standing to seek such relief because of the adverse effect that such  discrimination has had on them individually, and on Non-Caucasian Employees  and  those who opposed  or reported racial discrimination, generally.

46.     To gain such relief for themselves, as well as for the putative  class members, the Class Representatives will first establish the existence of  systemic racial discrimination and retaliation as the premise for the relief  they seek.  Without class certification, the same evidence and issues would be  subject to re-litigation in a multitude of individual lawsuits, with an attendant risk of inconsistent adjudications

and conflicting obligations.    Certification of the proposed class of Non-Caucasian Employees and those who have reported or opposed racial discrimination, who have been affected by these common questions of law and fact, is the most efficient and judicious means of presenting the evidence and arguments necessary to resolve the questions for the Class Representatives, the proposed class, and Defendant.

47.    The Class Representatives' individual and class claims are premised upon the traditional bifurcated method of proof and trial for disparate impact and systemic disparate treatment claims of the type at issue in this case. A bifurcated method of proof and trial is the most efficient method of resolving such common issues.

**C.    Numerosity and Impracticality of Joinder**

48.    The class which the Class Representatives seek to represent is too numerous to make joinder practicable. The proposed class consists of hundreds of current and former Non-Caucasian Employees and those who opposed or reported race discrimination during the liability period.

**D.    Common Questions of Law and Fact**

49.    The prosecution of the claims of the Class Representatives will require the adjudication of numerous questions of law and fact common to both their individual claims and those of the putative class they seek to represent.

50.    The common questions of law include, *inter alia*, whether Defendant engaged in unlawful, systemic race discrimination and retaliation in its selection,

promotion, advancement, transfer, training, and discipline policies, practices or procedures, and in the general terms and conditions of work and employment; whether Defendant is liable for a continuing systemic violation of Section 1981; and a determination of the proper standards for proving a pattern or practice of discrimination or retaliation by Defendant against its Non-Caucasian Employees or those who oppose or report racial discrimination.

51.     The common questions of fact would include, *inter alia*: whether Defendant has, through its policies, practices or procedures, (a) denied or delayed the promotion of Non-Caucasian Employees, or those who opposed or reported racial discrimination; (b) precluded Non-Caucasian Employees or those who opposed or reported racial discrimination from eligibility for promotions, by denying them training which employees who are Caucasian or those who did not oppose or report racial discrimination are granted; (c) paid Non-Caucasian Employees or those who opposed or reported racial discrimination at a disparate level; (d) subjected Non-Caucasian Employees, or those who opposed or reported racial discrimination, to differential treatment, including, but not limited to, less preferable work assignments, inequitable evaluations and stricter disciplinary policies, practices or procedures; and (e) subjected Non-Caucasian Employees, or those who opposed or reported racial discrimination, to hostility or a hostile work environment.

52.     The employment policies, practices and procedures to which the Class Representatives and the class members are subject are set at Defendant's corporate

level and apply universally to all class members throughout the world. These employment policies, practices and procedures are not unique or limited to any one department; rather, they apply to all departments, and, thus, affect the Class Representatives and proposed class members in the same ways no matter the district, division, or position in which they work.

53.    Throughout the liability period, a disproportionately large percentage of the managers and supervisors at Defendant have been Caucasian or those who do not oppose or report race discrimination.

54.    Discrimination in selection, promotion and advancement occurs as a pattern and practice throughout all levels and all divisions of Defendant. Selection, promotion, and advancement opportunities are driven by personal familiarity, subjective decision-making, preselection and interaction between Caucasian managers, supervisors, and subordinates and those who have not opposed or reported retaliation rather than by merit or equality of opportunity.

55.    As a result, employees who are not Non-Caucasian Employees or who have not opposed or reported race discrimination have advanced, and continue to advance, more rapidly to better and higher paying jobs than do Non-Caucasian Employees or those who opposed or reported racial discrimination.

56.    Defendant's policies, practices and procedures have had an adverse impact on Non-Caucasian Employees or those who opposed or reported racial discrimination seeking selection for, or advancement to, better and higher paying

positions.  In general, within Defendant's employment structure, a higher level of job classification correlates with  a lower percentage of Non-Caucasian Employees or those who opposed or reported  racial discrimination employees holding those positions.

57.     In short, the greater a job's seniority or benefits, the less likely a Non-Caucasian Employee, or one who opposed or reported racial discrimination, holds that position.

### E.     Typicality of Claims and Relief Sought

58.     The claims of the Class Representatives are typical of the claims  of the proposed class. The Class Representatives assert claims in each of the  categories of claims asserted on behalf of the proposed class. The relief sought by the Class Representatives for race discrimination against Non-Caucasian Employees or those who  opposed or reported racial discrimination complained of herein is also typical of the relief which is sought on behalf of the proposed class.

59.     The Class Representatives are, like the members of the proposed  class, employees who worked for the Defendant during the  liability period.

60.     Discrimination in selection, promotion, advancement, and  training affects the compensation of the Class Representatives and all the  class members in the same ways.

61.     Differential treatment between employees based on race or those  who opposed or reported racial discrimination occurs as a pattern and  practice throughout

all levels and departments of Defendant.  For example, Defendant  predominantly holds Non-Caucasian Employees and those who opposed or reported  racial discrimination, including both the Class Representatives  and class members, to stricter standards than employees who are not.  Non-Caucasian Employees  and those who have opposed or reported racial discrimination  often receive lower performance appraisals than others  despite performing equally well or better.  Non-Caucasian Employees and those who  opposed or reported racial discrimination are also disciplined, formally and  informally, more frequently and severely than their Caucasian counterparts. Additionally, employees outside these categories—*i.e.*, employees who are Caucasian and  have  not  opposed  or  reported  racial  discrimination—more  often  receive preferable work assignments and other preferential treatment.

62.     Discrimination in the form of a hostile work environment occurs  as a pattern and practice throughout all levels and departments of  Defendant and affects the Class Representatives and the members of the  class in the same ways.  Supervisors and employees have made racially  hostile comments; harassed and intimidated Non-Caucasian Employees and those who opposed or reported racial discrimination; have made it clear in  various ways that they favor employees who are Caucasian or  those who have not opposed or reported racial discrimination; and otherwise have  created a working environment hostile to Non-Caucasian Employees or  those who opposed or reported racial discrimination.

63.     The Class Representatives, and other employees, have  complained to

Defendant's management and human resources personnel about race  discrimination and a racially hostile work environment, as well as retaliation  for those who opposed or reported racial discrimination. Defendant's investigations into these complaints have been inadequate or superficial, to the extent Defendant has investigated at all.

64.    The Class Representatives and the class members have been  affected in the same ways by Defendant's failure to implement adequate  procedures to detect, monitor, and correct its pattern and practice of  discrimination.

65.    Defendant failed to create adequate incentives for its  managers to comply with equal employment opportunity laws regarding each  of the employment policies, practices and procedures referenced in this  Complaint and have failed to discipline adequately its managers and other  employees when they violate the anti-discrimination and anti-retaliation  laws. These failures have affected the Class Representatives and the class  members in the same ways.

66.    The relief necessary to remedy the claims of the Class  Representatives is exactly the same as that necessary to remedy the claims of  the proposed class members in this case.

67.    The Class Representatives seek the  following relief for their individual claims and for those of the members of the  proposed class:

(a) a declaratory judgment that Defendant has engaged in  systemic racial discrimination against Non-Caucasian Employees and those  who opposed or reported racial discrimination by, *inter alia*, limiting their ability to be

promoted to better and higher paying positions, limiting their employment opportunities to lower and less desirable classifications, limiting their training and transfer opportunities, exposing them to differential treatment, and subjecting them to hostility at work;

(b) a permanent injunction against such continuing discriminatory or retaliatory conduct;

(c) injunctive relief which effects a restructuring of Defendant's promotion, transfer, training, performance evaluation, compensation, work environment, and discipline policies, practices and procedures so that Non-Caucasian Employees or those who opposed or reported racial discrimination will be able to compete fairly in the future for promotions, transfers, and assignments to better and higher paying classifications with terms and conditions of employment traditionally enjoyed by other employees;

(d) injunctive relief which effects a restructuring of the Defendant's workforce so that Non-Caucasian Employees or those who opposed or reported racial discrimination are promoted into higher and better paying classifications which they would have held in the absence of Defendant's past racial discrimination or retaliation;

(e) back pay, front pay, and other equitable remedies necessary to make Non-Caucasian Employees and those who opposed or reported racial

discrimination whole from the Defendant's past discrimination;

(f) compensatory damages;

(g) punitive and nominal damages to prevent and deter Defendant from engaging in similar discriminatory or retaliatory practices in the future; and

(h) attorneys' fees, costs and expenses.

### F.    Adequacy of Representation

68.    The Class Representatives' interests are co-extensive with those of the members of the proposed class, which they seek to represent in this case. The Class Representatives seek to remedy Defendant's discriminatory and retaliatory employment policies, practices and procedures so that Non-Caucasian Employees and those who have opposed or reported racial discrimination will no longer be prevented from advancing into higher paying and more desirable positions, will not receive disparate pay and differential treatment, and will not be subjected to racial hostility at work. The Class Representatives are willing and able to represent the proposed class fairly and vigorously as they pursue their similar individual claims in this action.

69.    The Class Representatives have retained counsel who are qualified, experienced, and able to conduct this litigation and to meet the time and fiscal demands required to litigate an employment discrimination class action of this size and complexity through trial and final judgment. The combined interests, experience, and resources of the Class Representatives and their counsel to litigate competently the individual and class claims at issue in this case clearly satisfy the adequacy of

representation requirement of Federal Rule of Civil Procedure 23(a)(4).

## VI.    CLASS CLAIMS

70.     The Class Representatives and the putative class they seek to represent have been subjected to a systemic pattern and practice of race discrimination or retaliation involving a battery of practices which have also had an unlawful, disparate impact on them and their employment opportunities.

71.     The discrimination at issue includes adhering to a policy and practice of restricting the promotion and advancement opportunities of Non-Caucasian Employees, and those who have opposed or reported racial discrimination, so that such employees remain in lower classification and compensation levels, as well as terminating Non-Caucasian Employees because of their race. Defendant in effect bars Non-Caucasian Employees from better and higher paying positions which have traditionally been held by other employees, and selectively terminates their employment. Defendant's systemic means of accomplishing such racial stratification include, but are not limited to, Defendant's promotion, training and performance evaluation policies, practices and procedures.

72.     Defendant's promotion, advancement, training, and performance evaluation policies, practices and procedures incorporate the following discriminatory practices:

(a) relying upon subjective judgments, procedures, and criteria which permit and encourage the incorporation of racial stereotypes and bias by

Defendant's predominately non-minority managerial and supervisory staff in making promotion, training, performance evaluation, compensation, and termination decisions;

(b) refusing or failing to provide equal training opportunities to Non-Caucasian Employees;

(c) refusing or failing to provide Non-Caucasian Employees with opportunities to demonstrate their qualifications for advancement;

(d) refusing or failing to establish and follow policies, practices, procedures, or criteria that reduce or eliminate disparate impact or intentional racial bias;

(e) using informal, subjective selection methods which allow for rampant racial discrimination;

(f) disqualifying Non-Caucasian Employees for vacancies by unfairly disciplining them;

(g) discouraging applications and expressions of interest by Non-Caucasian Employees;

(h) penalizing Non-Caucasian Employees for exercising the rights afforded to them by Section 1981;

(i) subjecting Non-Caucasian Employees to overt and implicit racial hostility in the work environment; and

(j) selectively terminating the employment of Non-Caucasian Employees.

73.     Defendant's promotion policies, practices and procedures have had a disparate impact on the Class Representatives and the class members. The policies, practices, and procedures are not valid, job-related, or justified by business necessity. There are alternative objective and more valid selection procedures available to the Defendant that are more closely related to the actual responsibilities of the positions, and which would have less of a disparate impact on Non-Caucasian Employees. However, the Defendant has failed or refused to use such alternative procedures.

74.     Defendant's promotion, training, performance evaluation, compensation, and transfer policies, practices and procedures are intended to have a disparate impact on the Class Representatives and the class they seek to represent. The practices form a part of the Defendant's overall pattern and practice of keeping Non-Caucasian Employees in lower job classifications, which have fewer desirable terms and conditions of employment, and causing termination of their employment.

75.     Because of Defendant's systemic pattern and practice of racial discrimination, the Class Representatives and class they seek to represent have been adversely affected and have experienced harm, including the loss of compensation, wages, back pay, and employment benefits.

76.     The Class Representatives and the class they seek to represent have been subjected to racial hostility or retaliation at work, both severe and pervasive, which affected the terms and conditions of his employment. The Defendant's actions and inactions encourage this behavior by its Caucasian employees.

77.    The individual Plaintiffs have no plain, adequate, or complete remedy at law to redress the rampant and pervasive wrongs alleged herein, and this suit is their only means of securing adequate relief. The Plaintiffs are now suffering irreparable injury from Defendant's unlawful policies, practices and procedures as set forth herein, and will continue to suffer unless those policies, practices and procedures are enjoined by this Court.

## VII.    CAUSE OF ACTION (Section 1981)

78.    Plaintiffs allege that Defendant discriminated and retaliated against the Class Representatives and all members of the proposed class by treating them differently from and less preferably than similarly situated Caucasian employees and subjecting them to discriminatory denials of promotions, discriminatory denials of pay raises, discriminatory performance evaluations, discriminatory subjection to disciplinary procedures, disparate terms and conditions of employment, harassment, hostile work environments, termination, and other forms of discrimination in violation of Section 1981.

79.    Defendant's conduct has been disparate, intentional, deliberate, willful and conducted in callous disregard of the rights of the Class Representatives and the members of the proposed class.

80.    Defendant's policies and practices have produced a disparate impact against the Class Representatives and the class members with respect to the terms and conditions of employment.

81.    By reason of the continuous nature of Defendant's discriminatory conduct, persistent throughout the employment of the Class Representatives and class members, the Class Representatives and class members are entitled to application of the continuing violation doctrine to all of the violations alleged herein.

82.    By reason of the discrimination suffered at Defendant's hands, the Class Representatives and the members of the proposed class are entitled to all legal and equitable remedies available under Section 1981.

### JURY DEMAND

83.    The Class Representatives request a trial by jury to the extent allowed by law.

WHEREFORE, the Class Representatives, on behalf of themselves and the members of the class whom they seek to represent, request the following relief:

A.    Certification of the case as a class action maintainable under Federal Rules of Civil Procedure 23(a), (b)(2) or (b)(3), on behalf of the proposed Plaintiff class, and designation of the Class Representatives as representatives of this class and their counsel of record as class counsel;

B.    Declaratory judgment that Defendant's employment policies, practices and/or procedures challenged herein are illegal and in violation of Section 1981;

C.    A permanent injunction against Defendant and their partners, officers, owners, agents, successors, employees and representatives and any and all persons acting in concert with them, from engaging in any further unlawful practices, policies,

customs, usages, or other actions constituting racial discrimination as set forth herein;

D.   An Order requiring Defendant to initiate and implement programs that (i) will provide equal employment opportunities for Non-Caucasian Employees; (ii) will remedy the effects of the Defendant's past and present unlawful employment policies, practices or procedures; and (iii) will eliminate the continuing effects of the discriminatory and retaliatory practices described.

E.   An Order requiring the Defendant to initiate and implement systems of assigning, training, transferring, compensating, and promoting Non-Caucasian Employees in a non-discriminatory manner;

F.    An Order establishing a task force on equality and fairness to determine the effectiveness of the programs described in (B) through (E) above, which would provide for (i) monitoring, reporting, and retaining of jurisdiction to ensure equal employment opportunity, (ii) the assurance that injunctive relief is properly implemented, and (iii) a quarterly report setting forth information relevant to the determination of the effectiveness of the programs described in (B) through (E), above;

G.   An Order directing Defendant to adjust the wage rates and benefits for the class members to the level they would be enjoying but for the Defendant's discriminatory policies, practices and/or procedures;

H.  An award of back pay, front pay, lost benefits, preferential rights to jobs

and other damages for lost compensation and job benefits suffered by the Class Representatives and the class members to be determined at trial;

I.   Any other appropriate equitable relief in favor of the Class Representatives  and class members;

J.   An award of compensatory, nominal and punitive damages to Plaintiffs;

K.   An award of litigation costs and expenses, including reasonable attorneys' fees, to the Plaintiffs and class members;

L.   Pre-judgment interest;

M.   Such other and further relief as the Court may deem just and proper; and

N.   Retention of jurisdiction by the Court until such time as the Court is satisfied that the Defendant has remedied the practices complained of herein and are determined to be in full compliance with the law.

Respectfully submitted,

**THE WILHITE LAW FIRM**

By: /s/ R. Lane Addison
     R. Lane Addison (**Local Counsel**)
     Texas Bar No. 24059355
     **laddison@wilhitelawfirm.com**
     2911 Turtle Creek Blvd., Ste. 300
     Dallas, Texas 75219-6247
     Tel. (469) 870-0870

     Omid Zareh
     ***Lead Counsel Pro Hac Vice Admission***
     ***Forthcoming***
     NY Bar No. 2763282
     Weinberg Zareh Malkin Price LLP
     45 Rockefeller Plaza, 20th Floor
     New York, NY 10111
     ozareh@wzmplaw.com
     212.899.5470 (main)
     212.899.5472 (direct)

     **ATTORNEY FOR PLAINTIFF(S)**

# EXHIBIT A

# Sports Collectibles Company Panini Under Fire For Zero Black Leadership, Boycott Demand of NBA, NFL, FIFA & More by Until Freedom

**PR Newswire**
May 16, 2023 · 2 min read



*Tamika D. Mallory & Rev. Michael McBride Also Shared Diversity Demands With Attorney Generals of Texas, New York, California*

NEW YORK, May 16, 2023 /PRNewswire/ ·· Today, Until Freedom co-founder Tamika D. Mallory and Black Church Political Action Committee co-founder Reverend Michael McBride announced that they penned a letter to sports and entertainment collectibles organization Panini, criticizing the company's lack of black leadership team and demanding immediate reform of its hiring practices.

Mallory and McBride issued the letter to Panini America CEO Mark Warsop on Monday, noting that while 75 percent of the organization's business is dependent on black and brown athletes, the company's leadership team doesn't reflect its diverse athletes at all.

The fact there is zero black leadership is more appalling, considering Panini has generated billions in revenue off the backs of black and brown athletes. Furthermore, of the organization's 800 employees listed on LinkedIn, only 3 are black employees. The disparity reaffirms that Panini has little to no black employees throughout its entire company.

As a result, Mallory and McBride gave the organization an ultimatum to take corrective action and hire black leadership to key positions immediately. If not, they plan to collectively urge Panini's partners and its athletes – which include the likes of FIFA, NBA, NFL, NBA Players Association, NFL Players Association and English Premier League – to boycott the company.

They also shared their demands for diversity with Texas Attorney General Ken Paxton, New York Attorney General Letitia James and

Quote Lookup

**TRENDING**

1. Australia's tight rental market forces tenants to make tough choices

2. UPDATE 2-Soccer-Inter reclaim Serie A top spot with 1-0 win against Roma

3. Soccer-United manager Ten Hag says derby loss one of most disappointing days of his tenure

4. Soccer-Inter reclaim Serie A top spot with 1-0 win against Roma

5. UAW escalates strike against lone holdout GM after landing tentative pacts with Stellantis and Ford

exclusion of black people from its leadership on the other hand, is unacceptable."

Mallory is a nationally recognized civil rights activist and co-founded Until Freedom, which is an intersectional social justice organization rooted in the leadership of diverse people of color to address systemic and racial injustice. She served as the youngest ever Executive Director of the National Action Network and was the co-chair of the Women's March on Washington – the largest single day demonstration in U.S. history. In the wake of the murder of George Floyd, Mallory delivered a powerful speech that was dubbed by many as "the speech of a generation."

McBride co-founded Black Church PAC, which is a strategic initiative answering the call to elect leaders committed to ending mass incarceration, defending the right to vote, curbing gun violence, and representing the equitable treatment of Black and Brown communities.

CONTACT: organizing@untilfreedom.com

C

Cision

View original content:https://www.prnewswire.com/news-releases/until-freedom-co-founder-tamika-d-mallory--black-church-pac-co-founder-rev-michael-mcbride-pen-letter-to-panini-criticizing-lack-of-black-leadership--demanding-immediate-reform-of-hiring-practices-301825908.html

SOURCE Until Freedom